1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10                        ----oo0oo----

11  ENVIRONMENTAL PROTECTION AND
    INFORMATION CENTER, a
12  California nonprofit
    corporation; and KLAMATH-
13  SISKIYOU WILDLANDS CENTER, an
    Oregon nonprofit corporation,
14                                      NO. CIV. S-04-1027 WBS GGH
              Plaintiffs,
15
         v.                             MEMORANDUM AND ORDER
16
    JACK BLACKWELL, in his
17  official capacity as Regional
    Forester for the Southwest
18  Pacific Region of the United
    States Forest Service;
19  MARGARET BOLAND, in her
    official capacity as Forest
20  Supervisor for the Klamath
    National Forest; and UNITED
21  STATES FOREST SERVICE,

22            Defendants.

23                        ----oo0oo----

24          The court is called upon to review the Finding of No

25  Significant Impact ("FONSI") issued by defendant Forest Service

26  ("FS") in October 2003 regarding the proposed harvesting and sale

27  of timber in the Westpoint area of the Klamath National Forest

28  (the "project").  Plaintiffs and defendants both move for summary

                                    1

judgment and plaintiffs seek an injunction against any further

work on this project.  Plaintiffs allege that defendants

violated the National Environmental Policy Act ("NEPA") and the

National Forest Management Act ("NFMA") in approving the project.

I. Factual and Procedural Background

    A. The Nature of the Project

       The stated goal of this project is to "manage the

landscape toward a condition that will be resilient to

catastrophic fire and other widespread disturbances.[1]  The intent

is not to maintain this landscape in a static condition."

(Environmental Assessment ("EA"), Administrative Record ("AR")

412).

       Defendant FS considered two alternatives in detail.

The first alternative was a "no action alternative," in which

"[n]o forest health or fuels reduction activities would occur on

public lands."  (Id. at 416).  The second alternative was chosen

by the FS.  Under this plan, approximately 1,026 acres of forest

stands in 53 units would be thinned in two general areas known as

"Middle Creek" and "Scott Bar Mountain."[2]  Units range in size

from 2 to 46 acres.  (Westpoint Project Wildlife Biological

Assessment/Evaluation ("Wildlife BA"), AR 1008).  The majority of

the trees to be harvested would be 8 to 22 inches in diameter at

breast height (dbh), with the average tree harvested being 16

---

[1]    These "other widespread disturbances" are nowhere
identified.

[2]    The units are not numbered sequentially.  The term
"Middle Creek" refers to both an area of proposed harvest as well
as the creek itself, which flows into the Scott River in the
general project area.

inches in diameter and 72 feet tall. (FONSI, AR 162). The fuels produced by this thinning would be treated in a variety of ways, mostly by controlled burning, to reduce the possibility of later fires. In addition, all stumps of Shasta red fir, white fir, and hemlock greater than twelve inches in diameter would be treated with a fungicide. The road network in the region would also be changed: 4.7 miles of roads would be decommissioned, 1.8 miles of temporary roads would be used and then hyrdrologically restored after the project, 6.8 miles of road would change from being closed year round to being closed seasonally, and 5.4 miles of road would change from being closed year round to being open year round. (EA, AR 413). Trees would be planted on 130 acres. (FONSI, AR 164). Finally, the plan would poison gophers in certain units to reduce the mortality of seedlings. (EA App. F, AR 174).

Units 53, 56, 59, and 25 are different from the other forty-nine units and are the source of much of the present controversy. Forty-two acres in Units 53 and 56 are classified as "late-successional" habitat. "Late-successional" habitat is defined as multi-storied Douglas-fir, conifer hardwood, and mixed conifer vegetation types with a minimum tree size of 24 inches dbh, a canopy closure of greater than 70%, and sufficient understory including slash, rotten logs, and stumps. (FONSI Appeal, AR 69). The FS found the thinning of this late-successional habitat "likely to adversely affect" the northern spotted owl ("NSO"), an endangered species. (Wildlife BA, AR 1027; see also id., AR 1022("Harvesting will result in the removal of 42 acres of [NSO] suitable habitat")). In addition,

1  these 42 acres provide potential nesting habitat for the northern

2  goshawk, a species listed by the FS as "sensitive." (<u>Id.</u>, AR

3  1029-30).  These same 42 acres are also suitable habitat for two

4  other sensitive species, the Pacific fisher and the California

5  wolverine.  (<u>Id.</u>, AR 1032-35).

6          Three acres within unit 25 are within the Designated

7  Recreational River land allocation for the Scott River,

8  designated as a Scenic and Recreational River in the National

9  Wild and Scenic River System.  (FONSI, AR 166-67).  Unit 59

10  contains an area designated as NSO Critical Habitat.  (Wildlife

11  BA, AR 1017).

12     B. <u>Procedural History</u>

13          Scoping for this project began in early 2002.  The

14  notice of intent to prepare an EA was published in the <u>Siskiyou</u>

15  <u>Daily News</u>, which publishes out of Yreka, on March 14, 2002, and

16  the <u>Pioneer Press</u>, which publishes out of Fort Jones, on March

17  20, 2002.  The National Oceanic and Atmospheric Administration-

18  Fisheries and the United States Fish and Wildlife Service were

19  consulted.  On June 13, 2003, the EA was circulated to those who

20  had showed an interest in the project.  (FONSI, AR 164).

21          The FS received comments on the EA from plaintiffs,

22  among others.  On October 15, 2003, the FS issued its FONSI,

23  signed by defendant Boland, and appended to that document

24  responses to some 80 comments.  Plaintiffs appealed to the Appeal

25  Deciding Officer.  (AR 85).  In an Appeal Decision Summary issued

26  January 15, 2004, Appeal Deciding Officer Bernard Weingardt

27  affirmed defendant Boland's FONSI.  (AR 67-81).

28  ///

II. <u>Discussion</u>

   A. <u>Standing</u>

       Before considering the substantive merits of this suit, the court must determine that plaintiffs meet standing requirements.  Defendants do not argue that plaintiffs lack standing.  In his declaration, George Sexton states that he is an active member of plaintiff Klamath-Siskyou Wildlands Center, an organization formed to protect the Klamath-Siskyou ecosystem, and that he regularly spends personal and professional time in the Middle Creek and Scott Bar Mountain areas.  Scott Greacen, in his declaration, states that he is an active member of plaintiff Environmental Protection Information Center, an organization formed to protect and restore Northwestern California ecosystems, and that he has visited and plans to return to the project area in the future.  These facts are sufficient to confer standing on plaintiffs to bring this suit.  <u>See</u> <u>Ocean Advocates v. United States Army Corps of Eng'rs</u>, 402 F.3d 846, 859-862 (9th Cir. 2005)(discussing standing requirements in the context of suit under NEPA).

   B. <u>Summary Judgment Standard</u>

       Both plaintiffs and defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary

judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving party must show more than a mere "metaphysical doubt" as to the material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

In this case, the court is called upon to review the findings of an agency adjudication.  "Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court."  Southwest Ctr. for Biological Diversity v. United States Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).  Materials outside the record may be allowed under three exceptions:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter.

Id. (quotation marks and citation omitted).  The parties have not asked the court to look outside the record developed in the FONSI and its supporting documents, and the court finds that none of the three Southwest Center exceptions applies in this case. Therefore, the record will not be developed further and this case is ripe for summary adjudication.

1    C. <u>Standard of Review</u>

2    The court reviews the decision of the FS under the
3  Administrative Procedure Act.  <u>Lands Council v. Powell</u>, 395 F.3d
4  1019, 1026 (9th Cir. 2005).  The United States has waived
5  sovereign immunity in this case under 5 U.S.C. § 702.  <u>See</u>
6  <u>Muckleshoot Indian Tribe v. United States Forest Serv.</u>, 177 F.3d
7  800, 804 (1999).  The court must reverse the agency action only
8  if the action is arbitrary, capricious, an abuse of discretion,
9  or otherwise contrary to law.  5 U.S.C. § 706(2).  This standard
10  is narrow, and does not permit a court to substitute its own
11  judgment for that of the agency.  <u>Citizens to Preserve Overton</u>
12  <u>Park v. Volpe</u>, 401 U.S. 402, 416 (1971).  The court must ask
13  "whether the [agency] decision was based on a consideration of
14  the relevant factors and whether there has been a clear error of
15  judgment."  <u>Id.</u>  The court must also determine whether the agency
16  "articulated a rational connection between the facts found and
17  the choice made."  <u>Ocean Advocates</u>, 402 F.3d at 859(citation
18  omitted).

19    D. <u>NEPA</u>

20    "NEPA exists to ensure a process, not particular
21  substantive results."  <u>Hells Canyon Alliance v. United States</u>
22  <u>Forest Serv.</u>, 227 F.3d 1170, 1177 (9th Cir. 2000).  Here, there
23  are two main issues under NEPA.  The first issue is whether the
24  FS was required to prepare an Environmental Impact Statement
25  ("EIS") rather than the abbreviated Environmental Assessment.
26  The second issue is whether the FS considered an adequate range
27  of alternatives to the project.
28  ///

7

1        1. <u>Necessity of an EIS</u>

2        Plaintiffs challenge the failure of the FS to prepare

3 an EIS for this project.  The relevant provision of NEPA provides

4 that "all agencies of the Federal Government shall . . . include

5 in every recommendation or report on proposals for legislation

6 and other major Federal actions significantly affecting the

7 quality of the human environment, a detailed statement by the

8 responsible official on – the environmental impact of the

9 proposed action."  42 U.S.C. § 4332(2)(C).  "Where an EIS is not

10 categorically required, the agency must prepare an Environmental

11 Assessment to determine whether the environmental impact is

12 significant enough to warrant an EIS."  <u>Ocean Advocates</u>, 402 F.3d

13 at 864.  If, after preparation of the EA, the agency decides not

14 to prepare an EIS, it must put forth a "convincing statement of

15 reasons [in the form of a FONSI] that explain why the project

16 will impact the environment no more than insignificantly."

17 <u>Id.</u>(citation omitted); <u>see also</u> 40 C.F.R. § 1508.13(listing

18 requirements for a FONSI).[3]  The FONSI is crucial to a court's

19 evaluation of whether the agency took the requisite "hard look"

20 at the potential impact of a project.  <u>Ocean Advocates</u>, 402 F.3d

21 at 864.

22        "[A]n EIS <u>must</u> be prepared if substantial questions are

23 raised as to whether a project <u>may</u> cause significant degradation

24 of some human environmental factor."  <u>Idaho Sporting Cong. v.</u>

25 <u>Thomas</u>, 137 F.3d 1146, 1149 (9th Cir. 1998)(citation

26

27    [3]   Unless otherwise noted, all citations to the Code of
28 Federal Regulations are to the 2003 version, the version in
effect at the time of the FONSI.

1  omitted)(emphasis in original)("Idaho Sporting Cong. I").  To

2  trigger the requirement for an EIS, "a plaintiff need not show

3  that significant effects will in fact occur[;] raising

4  substantial questions whether a project may have a significant

5  effect is sufficient."  Id. at 1150(citation omitted)(emphasis in

6  original).

7        40 C.F.R. § 1508.27 explains how an agency or court is

8  to interpret "significantly" in 42 U.S.C. § 4332(2)(C).  The

9  regulation gives the term two components: context and intensity.

10 Context refers to the setting in which it takes place.  Intensity

11 means "the severity of the impact."  40 C.F.R. § 1508.27.

12       Plaintiffs argue that the context of this project

13 weighs in favor of requiring an EIS.  They contend that

14 defendants are implementing "a policy of old growth/late-

15 successional logging within the Scott River Watershed."  (Pls.'

16 Mem. in Supp. of Summ. J. at 33).  To support the existence of

17 this policy, plaintiffs cite other projects occurring in the

18 general vicinity.  Plaintiffs also contend that the Scott River

19 is an "impaired watershed."  Defendants counter by noting that

20 the projects to which plaintiffs refer are twenty-five miles away

21 from Westpoint and, therefore, these projects should not be

22 considered relevant to the context of the project. (Defs.' Mem.

23 in Opp'n to Pls.' Mot. for Summ. J. at 22-23).  Defendants

24 further argue that plaintiffs have not defined what they mean by

25 "impaired watershed" and point the court to documents in the

26 record that show that watershed effects of the Westpoint project

27

28

would not be significant.[4]  (Defs.' Reply at 14-15; see EA, AR
425(chart supporting defendants' assertions)).

     In considering the severity of a project's impact, a
reviewing agency should consider ten factors.[5]  "[O]ne of these

_____

     [4]   Plaintiffs did define what they meant by "impaired
watershed" in their initial memorandum in support of their
motion.  They claim that "[t]he Scott River is a 303(d) listed
water body with sedimentation/siltation and temperature
identified as water quality limiting factors. . . . The Middle
Creek/Scott River subwatershed is impaired due to sediment and
high temperature."  (Pls.' Mot. for Summ. J. at 6); see also 33
U.S.C. § 1313(d)(Section 303(d) of the Clean Water Act, entitled
"Identification of areas with insufficient controls; maximum
daily load; certain effluent limitations revision").  The portion
of the record plaintiffs cite for the proposition that the Scott
River is a § 303(d) listed river does not support the
proposition.  However, the record does support the fact that some
of the proposed harvesting would take place in a Wild & Scenic
River Corridor, (AR 377 (map)), and that there are already high
levels of sediment in the river.  (Biological Assessment for
Threatened, Endangered, Proposed, and Sensitive Species That May
Be Affected by the Westpoint Vegetation Treatment Project ("Fish
BA"), AR 494-95).

     [5]   The following should be considered in evaluating
intensity:

     (1) Impacts that may be both beneficial and adverse.  A
     significant effect may exist even if the Federal agency
     believes that on balance the effect will be beneficial.

     (2) The degree to which the proposed action affects
     public health or safety.

     (3) Unique characteristics of the geographic area such
     as proximity to historic or cultural resources, park
     lands, prime farmlands, wetlands, wild and scenic
     rivers, or ecologically critical areas.

     (4) The degree to which the effects on the quality of
     the human environment are likely to be highly
     controversial.

     (5) The degree to which the possible effects on the
     human environment are highly uncertain or involve
     unique or unknown risks.

     (6) The degree to which the action may establish a
     precedent for future actions with significant effects

10

factors may be sufficient to require preparation of an EIS in appropriate circumstances." Ocean Advocates, 402 F.3d at 865. Factor (1) should be kept in mind by a reviewing court as it considers the other factors. "A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. 1508.27(b)(1).

Plaintiffs argue that intensity factors (2), (3), (4), and (9) raise sufficient substantial questions regarding whether the project may have a significant effect to require an EIS. Plaintiffs have also made important arguments regarding factor (5) in their memoranda, although these arguments are not found under plaintiffs' EIS heading. Therefore, the court will address factor (5) as well.

---

or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or object listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27.

1

2                    a. Degree of Effects on Public Health

3           Plaintiffs state that the poisoning of gophers with

4  strychnine has the potential to cause secondary poisoning to

5  other species, which in turn could come into contact with humans.

6  In a separate argument, plaintiffs state that Middle Creek

7  supplies water to some cabin owners, that the project will affect

8  the water quality of the creek, and that "[t]he presence of

9  domestic water use is also a basis to require an EIS."  (Pls.'

10  Mem. in Supp. of Summ. J. at 35).

11          The risk of secondary poisoning related to the gopher

12  poisoning was considered in the EA.  (EA App. F, AR 174).  The EA

13  cites studies conducted in 1997, 2001, and 2002, and concludes

14  that "studies of gopher baiting have shown little risk of

15  secondary poisoning."  Id.  The court defers to the agency in its

16  assessment of scientific evidence, Anderson v. Evans, 371 F.3d

17  475, 489 (9th Cir. 2004), and therefore finds that the risk of

18  secondary poisoning due to gopher baiting is not significant.

19          Regarding the domestic water usage, plaintiffs point to

20  the Fish BA, which states that "[t]here are one or two small

21  water diversions in lower Middle Creek near its confluence with

22  the Lower Scott River.  These supply streamside cabin owners with

23  water. . . ."  (AR 508).  The FS points out that these

24  "diversions" are in the form of springs used by cabin owners

25  during the summer months, (Earth Scientist Report ("ESR"), AR

26  611) and that there are "no domestic uses of surface water in

27  Middle Creek."  (EA App. F, AR 191).  The court thus finds that

28  consideration of factor (2) does not support a finding that this

1

2  is a significant action.

3              b. Unique Characteristics of the Area

4            An area's "unique characteristics" are defined to

5  include "ecologically critical areas."  40 C.F.R. §

6  1508.27(b)(3).  Part of unit 59 is located within designated

7  critical habitat for the NSO.  (BA, AR 1017).  Unit 59 is within

8  0.7 miles of a known NSO activity center and contains nesting and

9  roosting habitat for the NSO.  (BA Map, AR 1051).

10           The BA dismisses the potential effect on the Critical

11 Habitat.  The entire analysis is as follows:

12      Unit #59 is contains [sic] an area mapped as NSO Critical
        Habitat (CA17) within the Matrix.  This area of CHU in
13      Matrix was analyzed by Level 1 Team and Forest wildlife
        biologists on September 8, 2001.  Analysis determined this
14      area of CHU in Matrix did not contain suitable NSO habitat
        and had no potential of reaching suitable habitat.  the
15      recommendation was to manage this as Matrix land.

16 (Wildlife BA, AR 1017).  This analysis is lacking.  The Forest

17 Service may not unilaterally change a critical habitat

18 designation to meet its needs on a given project.  16 U.S.C. §

19 1533(b)(3)(D)(notice and comment process must be followed to

20 revise a critical habitat designation).[6]  This harvesting within

21 NSO critical habitat raises substantial questions about the

22 project's environmental effects.

23 ///

24 ///

25 ///

26

27         [6]   Plaintiffs brought this point to defendants' attention
   in both its initial memorandum and its response.  Defendants,
28 interestingly, chose not to address it.

                                 13

1

2          c. Degree of Controversy

3          "A federal action is controversial if a substantial

4   dispute exists as to its size, nature or effect."  Wetlands

5   Action Network v. United States Army Corps of Eng'rs, 222 F.3d

6   1105, 1122 (9th Cir. 2000)(citation omitted).  "A substantial

7   dispute exists when evidence, raised prior to the preparation of

8   an EIS or FONSI, casts serious doubt upon the reasonableness of

9   an agency's conclusions."  Nat'l Parks & Conservation Ass'n v.

10  Babbitt, 241 F.3d 722, 736 (9th Cir. 2001)(citation omitted).

11  Once this evidence is presented to the agency, the agency has the

12  burden of demonstrating why this evidence does not create a

13  controversy.  Id.   "The existence of opposition to a use,

14  however, does not render an action controversial."  Wetlands

15  Action Network, 222 F.3d at 1122.

16         Plaintiffs and others wrote to the FS, prior to the

17  preparation of the FONSI, demonstrating their concern about the

18  reliability of the FS's assumptions.  (AR 248-345, 348-64).  The

19  letters contain a brief synopsis of the reasons why logging

20  larger trees is counterproductive to future fire suppression and

21  refer to several articles on the subject.  In contrast, the FS's

22  Fuels and Fires Assessment is less academic in nature, and

23  heavily relies on the Forest Vegetation Simulator and the First

24  Order Fire Effects Model.  (See AR 643).  The Fuels and Fires

25  Assessment does not provide any scientific support for the

26  accuracy of these models.  The FS also does not directly address

27  the arguments of the scientists who claim that logging larger

28  trees is not beneficial to fire suppression, other than claiming,

14

without support, that the models are "state of the art tools."

(See Fuels and Fires Assessment, AR 645-48; FONSI, AR 182);

compare Wetlands Action Network, 222 F.3d at 1122(in finding that

a significant public controversy did not exist, the court noted

that "a dispute as to the effect that the [proposed permitting

action] would have on the environment did exist.  During the two

year review process, the [agency] was able to address these

potential effects to the satisfaction of the federal resource

agencies, for all of the agencies eventually withdrew their

objections to the issuance of the permit").  Plaintiffs have

raised substantial questions on whether this project is

significantly controversial.

### d. Uncertain or Unknown Risks

Plaintiffs argue that the FS left short-term fire

risks, risks resulting from changes in the road network, as well

as risks to the watershed, the soil, and sensitive species,

unanalyzed.  The FS prepared an adequate analysis of the short-

term increase in the likelihood of fire, and concluded, after

modeling the action and no-action alternative, that the decreased

risk of stand replacing fire in the future justified the short

term risk.  (Fire and Fuels Assessment, AR 634-645).  The FS also

prepared an adequate soil and watershed analysis.  (See ESR, AR

608-633).  The FS also prepared an adequate analysis of the

impact of the changes in the road system.  (See Roads Analysis

Process Paper, AR 1090-1105).

However, plaintiffs' argument that the effect of the

project on certain sensitive species is uncertain has merit.  In

15

addition to finding that the project was "likely to adversely affect" the NSO, the Wildlife BA briefly discussed the impact of the project on various sensitive species.  The Wildlife BA finds that "42 acres of mature and older forest (potential goshawk nesting habitat) will be removed by harvest in units 53 and 56. This is unsurveyed habitat."  (AR 1030)  In the next sentence, the BA declares that "[t]he harvesting of these units will have a low potential of disturbing nesting goshawks."  This conclusion is unsupported by any evidence, and therefore is not a "convincing statement of reasons."  See Blue Mts. Biodiversity Project v. Blackwood, 161 F.3d 1208, 1213-14 (9th Cir. 1998)("The EA's cursory and inconsistent treatment of sedimentation issues, alone, raises substantial questions about the project's effects on the environment and the unknown risks to the area's renowned fish populations.").  Similar cursory analysis is given to the Pacific fisher.  (Id., AR 1033)("The Westpoint Project proposes to harvest 51 acres of suitable habitat.  It is unknown if these 51 acres are occupied. . . . The implementation of the proposed timber harvest will result in an overall removal of 50 acres of mature and older forest [and] will no longer provide potential reproductive habitat quality.").  About the California wolverine, the Wildlife BA states "there is some evidence, although somewhat dated (1973) the numbers [of California wolverines] appear to be increasing in California."  (AR 1034).  The California wolverine would also lose 42 acres of habitat, and "[t]here is a potential for secondary poisoning to occur" due to the gopher baiting. (Id., AR 1035).  The FS was also uncertain in its analysis of the

16

effects on the American marten.  "No formal surveys for [American marten] have been conducted in the area."  (Id., AR 1036).  The American marten would lose 27 acres of suitable denning habitat.  (Id., AR 1037).  The FS also does not know the effect of the project on the pallid bat.  "[S]urveys have not been conducted."  (Id., AR 1037-38).  There would be a degradation in 1,026 acres of pallid bat habitat.  (Id., AR 1038).  These examples show that the FS has not conducted surveys on sensitive species despite specific instruction to do so in the Forest Management Plan Standards & Guidelines.  (AR 2236)("Project areas should be surveyed for the presence of Sensitive species before project implementation.  If surveys cannot be conducted, project areas should be assessed for the presence and condition of Sensitive species habitat.")(emphasis added).  Plaintiffs have succeeded in raising substantial questions about the significance of uncertain or unknown risks.  See Friends of the Clearwater v. Dombeck, 222 F.3d 552, 558 (9th Cir. 2000)(finding that Forest Service had to prepare a supplementary EIS after seven species were newly designated as sensitive).

                    e. Relation to Other Actions

         Plaintiffs argue that defendants did not consider "the Whittler, the Jack Heli, and the Jack conventional timber sales."  (Pls.' Mem. in Supp. of Summ. J. at 30).  However, defendants convincingly argue that, since these projects are twenty-five miles away from the Westpoint project, they were reasonably not included in the cumulative effects analysis.  See Idaho Sporting Cong. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002)("Idaho

1

2   <u>Sporting Cong. II</u>")("Ordinarily, an agency has discretion to

3   determine the physical scope used for measuring environmental

4   impacts").

5          No documents in the record analyze the cumulative

6   effect of this project with the Jack Heli, the Whittler, and the

7   Jack conventional timber sales.  However, the Wildlife BA

8   analyzes the effects of <u>other</u> projects on sensitive species, and

9   concludes, for each species, that these other projects will not

10  impact the sensitive species' habitat.  (AR 1025-45)(discussing

11  effects of "Scott Bar Mountain Fuels Reduction Project," and

12  "Pre-commercial Thinning Project" on sensitive species).

13         Plaintiffs argue that defendants do not consider the

14  cumulative effects of this project, the Scott Bar Mountain Fuels

15  Reduction Project and the Pre-commercial Thinning Project on the

16  Middle Creek watershed.  In its response, the FS points the court

17  to the Earth Scientist Report, which contains a subsection

18  entitled "Cumulative Watershed Effects."  (AR 619-25).  Nowhere

19  in these pages, however, does the ESR discuss the effects of

20  other projects, such as the Scott Bar Mountain Fuels Reduction

21  Project and the Pre-Commercial Thinning Project, on the Middle

22  Creek Watershed.  The use of the word "cumulative" in this

23  portion of the report is deceptive, as it does not refer to the

24  cumulative effects of this project along with others, but only

25  the "cumulative effects" of "units within the project area."

26  (ESR, AR 619).  <u>See</u> <u>Ocean Advocates</u>, 402 F.3d at 868("This

27  cumulative analysis must be more than perfunctory; it must

28  provide a useful analysis of the cumulative impacts of past,

18

1

2  present, and future projects.")(citation omitted).  Plaintiffs

3  have succeeded in raising substantial questions about the

4  significance of cumulative watershed effects.

5  f. <u>Adverse Effect on Endangered Species</u>

6  The Wildlife BA frankly states that this project is

7  "likely to adversely affect" the NSO.  The question is whether

8  that is enough to raise substantial questions about the

9  significance of this project's effect on the NSO.  The law on

10 this question does not provide clear guidance.  <u>Compare</u> <u>W. Land</u>

11 <u>Exch. Project v. United States Bureau of Land Mgmt.</u>, 315 F.Supp

12 2d 1068, 1090-92 (D. Nev. 2004)(finding that, even though the

13 agency concluded that "there [was] no evidence that [the project]

14 will result in significant impacts to the desert tortoise [a

15 threatened species]," the fact that the agency "acknowledged that

16 direct and indirect impacts to a federally listed species could

17 occur" was sufficient to raise a substantial question in the 40

18 C.F.R. § 1508.27(b)(9) context) <u>with</u> <u>Heartwood, Inc. v. United</u>

19 <u>States Forest Serv.</u>, 380 F.3d 428, 431-32 (8th Cir. 2004)(finding

20 that, although the Biological Opinion concluded that "adverse

21 effects are likely to occur to the Indiana bat [an endangered

22 species]," the degree to which the bat was adversely affected was

23 small, and therefore plaintiffs had not raised a substantial

24 question in the 40 C.F.R. § 1508.27(b)(9) context).

25 This court finds that the likelihood of adverse effects

26 to the NSO, combined with the removal of NSO critical habitat

27 already discussed, raises substantial questions about the

28 significance of this project's effect on the NSO.  The Wildlife

1

2   BA finds that 42 acres of suitable nesting habitat will be

3   removed, (AR 1019), and that 138 acres of dispersal habitat will

4   be removed.  (AR 1020).  The removal of this dispersal habitat

5   "<u>will</u> slightly increase fragmentation of the NSO habitat" as

6   "[t]he Klamath Mountains provide an important dispersal habitat

7   linkage between the Cascades, Sierra Nevada's [sic] and the coast

8   range."  (AR 1019, 1016)(emphasis added).  Although the FS

9   concludes that the project "will result in an approximate less

10  [sic] than 0.01% reduction of NSO suitable habitat" across Forest

11  Service land, (AR 1019), the significance of removing this

12  "important dispersal habitat linkage" should be further explored

13  in an EIS.

14          2. <u>Adequacy of Alternatives</u>

15          NEPA requires federal agencies to "study, develop, and

16  describe appropriate alternatives to recommended courses of

17  action in any proposal which involves unresolved conflicts

18  concerning alternative uses of available resources."  42 U.S.C. §

19  4332(2)(E); <u>see also</u> 40 C.F.R. § 1508.9(discussion of

20  alternatives required in an EA); <u>Bob Marshall Alliance v. Hodel</u>,

21  852 F.2d 1223, 1228-29 (9th Cir. 1988)("[C]onsideration of

22  alternatives is critical to the goals of NEPA even when a

23  proposed action does not trigger the EIS process"); <u>Akiak Native</u>

24  <u>Cmty. v. United States Postal Serv.</u>, 213 F.3d 1140, 1148 (9th

25  Cir. 2000)(noting that EA must consider a reasonable range of

26  alternatives).  Because the Ninth Circuit has recognized that an

27  EA, like an EIS, must include a reasonable range of alternatives,

28  the court draws upon case law with respect to alternatives

1

2    developed in an EIS.  Defendants cite an Eighth Circuit case for

3    the proposition that the range of alternatives an agency must

4    consider under NEPA is smaller when preparing an EA than when

5    preparing an EIS, but that proposition is unsupported by Ninth

6    Circuit case law.  (Defs.' Reply Mem. at 18); see Olmsted

7    Citizens for a Better Cmty. v. United States, 793 F.2d 201, 208

8    (8th Cir. 1986).

9         The choice of alternatives is bounded by some notion of

10   feasibility and an agency is not required to consider remote and

11   speculative alternatives.  Vt. Yankee Nuclear Power Corp. v.

12   Natural Res. Def. Council, Inc., 435 U.S. 519, 551 (1978).  An

13   agency is not required "to undertake a separate analysis of

14   alternatives which are not significantly distinguishable from

15   alternatives actually considered."  Westlands Water Dist. v.

16   United States Dep't of the Interior, 376 F.3d 853, 868 (9th Cir.

17   2004)(citation omitted).  The touchstone for a court's inquiry

18   into the adequacy of the alternatives considered is whether the

19   discussion of alternatives fosters informed decision-making and

20   public participation.  Id.

21        Here the agency considered in detail two alternatives.[7]

22   The first alternative, the no-action alternative, was described

23   in the EA:

24        No forest health or fuels reduction would occur on public
         lands in the project area at this time.  Management in the
25       area would include regular administrative activities
         required to manage special uses, recreation, maintain roads,
26

27        [7]    The FS also summarily dismissed two other alternatives,
     a "no-harvest, restoration only alternative" and a "chemical-free
28   alternative."  (EA, AR 420).

21

suppress fires, and reduce fuels.  Future stand conditions
would be determined by natural or human-caused events (for
example, human-caused wildfire).

(AR 416).  The second alternative was the one chosen by the FS
and is the subject of this litigation.

In Muckleshoot Indian Tribe, the Forest Service
considered "only a no action alternative along with two virtually
identical alternatives."  177 F.3d at 813.  The court found that
the Forest Service had failed to consider adequate alternatives.
Id. at 814.  The present case is more extreme.  The no-action
alternative, the only alternative that the FS considered in
detail, was one that clearly did not meet the stated goal of the
project, and thus the selection of alternative two was
preordained.  (See EA, AR 412)("The goal is to manage the
landscape toward a condition that will be resilient to
catastrophic fire and other widespread disturbances.  The intent
is not to maintain this landscape in a static condition.")
(emphasis added).

In this case, there was an obvious, viable alternative
that the FS did not consider.  The FS should have considered an
option which would exclude from harvest units 53, 56, 59, and 25,
and would substitute other parts of the forest that do not
contain critical habitat for an endangered species, nesting
habitat for that species, or an area designated as Recreational
River land.  The existence of a viable but unexamined alternative
shows that an adequate range of alternatives was not considered.
Westlands, 376 F.3d at 868.  Defendants do not point to any part
of the record explaining the basis for choosing the land for this

1

2  project, nor does the record explain why harvesting in units 53,

3  56, 59, and 25 is vital to the project.[8]  If the FS chooses to go

4  forward with the project and prepare an EIS, it must consider

5  obvious, viable options.[9]

6       E. NFMA

7            The National Forest Management Act requires the FS to

8  create a comprehensive Forest Plan for each national forest.

9  Lands Council, 395 F.3d at 1032(citing 16 U.S.C. §§ 1604(a),

10 (e)).  "Once the Forest Plan is adopted, NFMA prohibits any site-

11 specific activities that are inconsistent with the Forest Plan."

12 Id. at 1033.

13            1. Viability

14            Plaintiffs' first NFMA argument is that the Forest Plan

15 does not ensure the viability of the NSO, an endangered species,

16 and the coho salmon, a species designated as threatened under the

17 Endangered Species Act ("ESA").  Under 36 C.F.R. § 219.19

18 (1994),[10] the FS has a duty to formulate its plans such that

19

20            [8]   Plaintiffs provide a cynical explanation of the reason
   for harvesting in units 53 and 56, pointing to an internal
21 document authored by District Ranger Ray Haupt.  (See AR
   1380)("commercial timber offering is the goal of this
22 project")(emphasis added).  That may very well be a legitimate
   goal of the project, but if so it should be clearly stated in the
23 documents that the FS provides to the public.

24            [9]   Plaintiffs make one more NEPA argument, claiming that
   the public has not been involved.  This argument is without
25 merit, as the numerous submitted comments on the project by
   plaintiffs and others demonstrate that the public was involved in
26 this process.

27            [10]  The Klamath National Forest Plan issued in 1994.  (See
   AR 2165-2459).  The regulation at issue was amended in 2000, and
28 is very different from what it was in 1994.

23

1

2    "viable populations of existing native and desired non-native

3    vertebrate species in the planning area" shall be maintained.

4    The same section defines a viable population as "one which has

5    the estimated numbers and distribution of reproductive

6    individuals to insure its continued existence is well distributed

7    in the planning area."

8          Plaintiffs argue that the present project would render

9    the NSO and the coho salmon not viable.  They argue that, since

10   the purpose of the ESA is to allow a species to recover, any FS

11   project that would impair that recovery is unlawful.

12         In evaluating plaintiffs' argument, a key distinction

13   between NFMA and NEPA must be highlighted.  NEPA is a statute

14   governing the FS's procedure in making its determinations in this

15   case.  NFMA, by contrast, is a substantive control on the FS's

16   actions.  See Inland Empire Pub. Lands Council v. United States

17   Forest Serv., 88 F.3d 754, 757-58 (9th Cir. 1996)(comparing the

18   two acts).  This court is in a much better position to evaluate

19   the procedures the FS followed or failed to follow than it is to

20   sift through the scientific evidence and  evaluate the ultimate

21   findings of the FS.  See Norton v. S. Utah Wilderness Alliance,

22   124 S.Ct. 2373, 2381 (2004)(a principal purpose of the APA is "to

23   avoid judicial entanglement in abstract policy disagreements

24   which courts lack both expertise and information to resolve").

25   Furthermore, this court's finding that an EIS is required before

26   this project may go forward renders any ruling on substantive

27   violations of the NFMA tentative at best. If and when an EIS is

28   prepared, the parties will likely return to this court to dispute

24

1

2   the substance of the EIS.  Hopefully the EIS will contain a more

3   complete evaluation of the effects of this project on the NSO,

4   and the court considers it more efficient to delay any decision

5   on any substantive violation of this regulation under the NFMA

6   until that time.[11]

7                    2. <u>Management Indicator Species</u>

8           Plaintiffs' second NFMA argument is that the FS failed

9   to measure the effect of the project on Management Indicator

10  Species ("MIS").[12]  "NFMA requires that the Forest Service

11  identify Indicator Species, monitor their population trends, and

12  evaluate each project alternative in terms of the impact on both

13  Indicator Species habitat and Indicator Species populations."

14  <u>Lands Council</u>, 395 F.3d at 1036.  These Indicator Species serve

15  as a proxy for the relative health of other species that rely on

16  the same habitat.

17          In this case, the FS used the "proxy-on-proxy"

18  approach, in which the population trends of the Indicator Species

19  are evaluated by evaluating the habitat in which those Indicator

20  Species live.  <u>See id.</u>  The Ninth Circuit has found this method

21  allowable in appropriate cases, but the methodology for

22  identifying the habitat proxy must be sound.  <u>Id.</u>; <u>see also</u>

23  <u>Inland Empire</u>, 88 F.3d at 760(deferring to agency's

24  interpretation of its own regulations to find that proxy-on-proxy

25

26          [11]  The FS considers Middle Creek not to be occupied by coho
    salmon.  (Fish BA, AR 505).
27

28          [12]  The court addresses this NFMA argument because it is
    easily disposed of at this stage.

1

2  approach was suitable under § 219.19).

3      Plaintiffs argue that the FS's methodology is flawed.

4  (Pls.' Mem. in Supp. of Summ. J. at 49)("the Forest Service has

5  failed to put forward any date to indicate that its methods of

6  assessing habitat and habitat relationships are fact accurate").

7  However, plaintiffs do not point to any particular methodological

8  flaw.  Compare Lands Council, 395 F.3d at 1036("Here, there is

9  evidence that the Forest Service's main tool for old growth

10 calculation, the timber stand management reporting system

11 database . . ., was inaccurate.").  The court has analyzed the

12 Westpoint MIS assessment, (AR 655-81), and does not find the

13 requisite flaws with the analysis are present so that the proxy-

14 on-proxy approach is not permissible.  The court defers to the

15 FS's expertise in developing the appropriate model for measuring

16 the population trends in the MIS.

17 III. Injunctive Relief

18      To determine whether injunctive relief is an

19 appropriate remedy for an agency's failure to prepare an

20 environmental impact statement, a court must apply the

21 traditional balance of harms analysis.  Nat'l Parks, 241 F.3d at

22 737.  Absent unusual circumstances, injunctive relief is the

23 appropriate remedy for a violation of NEPA.  Forest Conservation

24 Council v. United States Forest Serv., 66 F.3d 1489, 1496 (9th

25 Cir. 1995).

26      In this case, legal remedies would be inadequate.

27 Plaintiffs do not seek money damages.  Even if they did, it would

28 be virtually impossible to quantify the damages resulting from

1

2   the FS's failure to prepare an EIS.  <u>See</u> <u>Amoco Prod. Co. v.</u>

3   <u>Village of Gambell</u>, 480 U.S. 531, 545 (1987)("Environmental

4   injury, by its nature, can seldom be adequately remedied by money

5   damages and is often permanent or at least of long duration,

6   i.e., irreparable.  If such injury is sufficiently likely,

7   therefore, the balance of harms will usually favor the issuance

8   of an injunction to protect the environment.").  In this case, if

9   the FS were allowed to go forward without preparing an EIS,

10  irreparable damage would be done.  The public interest also

11  weighs in favor of granting an injunction, as that interest is

12  expressed in the NEPA statute and the ESA.  On the other hand, if

13  an injunction issues the FS will be unable to collect the value

14  of the timber to be harvested.  However, after the FS has

15  complied with its obligations under NEPA, assuming it chooses to

16  go forward with this project, it may be able to collect the value

17  of the timber.  Therefore, the balance of harms clearly favors

18  the plaintiffs in this case.

19        Given the above, the court grants plaintiffs' request

20  for injunctive relief.  Defendants are enjoined from proceeding

21  with the Westpoint project until such time as the Forest Service

22  satisfies its NEPA obligations.  <u>See</u> <u>Muckleshoot Indian Tribe</u>,

23  177 F.3d at 815(similar injunction).

24        IT IS THEREFORE ORDERED that:

25        (1) plaintiffs' motion for summary judgment be, and the

26  same hereby is, GRANTED, and defendants' motion for summary

27  judgment be, and the same hereby is, DENIED, to the extent that

28  the defendants violated NEPA by failing to prepare an

Environmental Impact Statement and by failing to consider an adequate range of alternatives;

(2) defendants' motion for summary judgment be, and the same hereby is, GRANTED, and plaintiffs' motion for summary judgment be, and the same hereby is, DENIED, to the extent that defendants did not violate NFMA;

(3) defendants be, and hereby are, PERMANENTLY ENJOINED from proceeding with the Westpoint project.  Should the FS at some point in the future comply with NEPA, it may move this court to dissolve this injunction.

DATED: May 4, 2005

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

28